**SO ORDERED.**

**SIGNED this 22 day of December, 2010.**



_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| JAMES E. MITCHELL and<br>KRISTIN S. MITCHELL, | 10-00825-8-SWH |
|       DEBTORS | |

### ORDER DENYING MOTION TO DISMISS

Pending before the court is the bankruptcy administrator's motion to dismiss the debtors' Chapter 7 case pursuant to 11 U.S.C. § 707(b)(3) on grounds that the totality of the debtors' financial circumstances demonstrates abuse. The debtors filed a response in opposition to the motion, and a hearing was held in Raleigh, North Carolina, on October 27, 2010. At the conclusion of the hearing, the parties were given the opportunity to file additional arguments and citations of authority, and the debtors filed a memorandum of law. The matter is ripe for disposition. For the reasons that follow, the motion to dismiss will be denied.

### BACKGROUND

The debtors filed a petition under Chapter 7 of the Bankruptcy Code on February 4, 2010. The bankruptcy administrator filed a motion to dismiss for abuse on May 7, 2010, and the debtors

filed a response in opposition to the motion on June 3, 2010. The bankruptcy administrator conducted a Rule 2004 examination on July 23, 2010, and the motion to dismiss was thereafter scheduled for hearing.

The debtors' Schedule I states that Mr. Mitchell is a computer engineer with Sony-Ericsson and earns $7,833.32 per month in gross wages, with monthly net wages of $5,613.80. At the time the Schedule I was filed, Mrs. Mitchell was employed and earning $1,293.37 per month in gross wages, with monthly net wages of $1,114.66. Their combined monthly net wages totaled $6,728.46. The debtors have two sons, ages 19 and 9. The debtors moved from North Carolina to Georgia in July of 2010, but their older son remains in Raleigh, where he attends Wake Technical Community College.

The debtors' original Schedule J listed $356.95 per month for utilities, including cell phones, internet, cable and satellite radio. The schedule includes $1,250 for food, $400 for transportation, $250 for entertainment and recreation, $60 for pet care, and $1,100 for "savings" per month. The Schedule J showed monthly net income of $19.85. The bankruptcy administrator stated during the hearing that the $1,100 allocation for savings, combined with the debtors' above-median income, was a red flag that prompted closer review. Upon that review, the bankruptcy administrator concluded that several of the debtors' other expenses – specifically, utilities, food, entertainment, and transportation – were also "on the high end."

On September 15, 2010, after their move to Georgia, the debtors provided to the bankruptcy administrator an amended (though unfiled) Schedule J, which removed the $1,100 "savings" allocation. The updated Schedule J was introduced at the hearing as Exhibit 1. Although the debtors' allocation for savings has been removed, other expenses have increased, and the updated

Schedule J shows a monthly net income of $13.55. The monthly expenses for food and for entertainment and recreation remain the same. The cell phone, internet, cable, and satellite radio expenses have increased to $382 ($25 increase), the debtors' transportation cost increased from $400 to $600 ($200 increase), and the debtors are now paying $325 toward their older son's college, car insurance, and living expenses. The debtors' housing expense is now $1,550 ($292 increase) and their electricity and heat costs are $475 ($295 increase).

At the hearing, the debtors provided testimony regarding the events that led up to the filing of their Chapter 7 petition. In January 2008, after fourteen years of employment, Mr. Mitchell was laid off from his job with Lear in Detroit, Michigan. He received no severance pay and was without income for two months. The debtors owned a home in Detroit that was secured by a first deed of trust in the amount of $154,000, and a second deed of trust in the amount of $60,000. At the time the petition was filed the house had decreased in value to $115,000. At one point, the house had been valued at over $180,000, but the shutdown of a General Motors plant significantly reduced property values. The debtors will surrender the Michigan property in their plan. Mr. Mitchell received a job offer from Sony-Ericsson in March 2008, pursuant to which the family moved to Raleigh. He testified that the move resulted in his older son leaving his high school at the end of his junior year.

Prior to the loss of his job, Mr. Mitchell testified, the debtors were able to pay their bills. In 2008, in connection with the job loss, move, and loss of equity in their home, the debtors incurred increasing consumer debt. The interest rates were high, then shifted to default rates. The debtors established a creditor payment plan through Percels & Associates, LLC, a debt consolidation organization, to pay $900 per month to creditors. The debtors contributed $900 per month from

November 2008 to December 2009, but one of the creditors filed a collection action against Mr. Mitchell in Wake County District Court seeking recovery of approximately $26,000. Mr. Mitchell characterized the lawsuit as the "final straw" precipitating the debtors' bankruptcy filing in February 2010.

In the spring of 2010, Sony-Ericsson announced a relocation to Atlanta, Georgia. Mr. Mitchell was unwilling to risk losing his job yet again and agreed to move. At the end of July 2010, shortly after the Rule 2004 exam, the debtors and their younger son moved to the Atlanta area. The debtors' elder son, having enrolled at Wake Technical Community College, remains in the Raleigh area. Mr. Mitchell testified that his son has an apartment, a steady job at Kroger, and a committed girlfriend. In light of the family's recent move just before their son's senior year of high school, his successful acclimation to Raleigh, and his college enrollment, the debtors support their son's decision to remain in Raleigh.

The debtors rented a four-bedroom home in Cummings, Georgia, which is north of Atlanta. Mr. Mitchell testified that he uses the fourth bedroom as an office, to provide functional space for the 16-17 computers he uses in connection with his work as Sony's only IT technician in the Atlanta area, and to provide a place for the debtors' son to stay when he comes to visit. Approximately six or seven of the computers belong to Sony. Mr. Mitchell stated that a significant portion of the couple's debt was incurred for the purchase of electronics, although, he testified, he has not purchased any additional electronic equipment in the last two years. Mr. Mitchell did not go to college and testified that his proficiency with electronic systems is self-taught and facilitated in large part by his longstanding practice of acquiring electronic systems and learning everything he can about how they work. Mrs. Mitchell is currently employed at Target working 15-20 hours a week,

for which she now earns approximately $600-800 per month, though she has asked for more hours. The debtors surrendered their 2007 Ford Escape and are now sharing a single vehicle, a 2009 Ford Fusion.

During the hearing the debtors testified, credibly, that the original $1,100 allocation for "savings" in their Schedule J was indicative of a goal to conserve funds but that the debtors did not ever retain that amount, or any other significant amount, as savings. Instead, the debtors testified, they devoted what funds they had to payment of creditors. When asked where that amount went, if not to savings, the debtors testified that whatever they had went toward the debt consolidation effort, creditors' bills, and living expenses.

The $1,100 allocation aside, the bankruptcy administrator contends that the debtors' amended Schedule J lists expenses for pet care, utilities, entertainment and recreation, transportation, and food that still are all on the "high side," and argues further that the debtors should not allocate approximately $325 per month toward car insurance and general support of their college-age son. Generally speaking, the bankruptcy administrator is of the view that above-median debtors capable of earning approximately $100,000 per year should be capable of paying something to creditors in a Chapter 13 plan.

In response, the debtors' testimony focused on many of the particular issues cited by the bankruptcy administrator. They testified, for example, that they have curtailed their food expenses to approximately $600 per month for food only (not including other household items), that they were able to save about $65 a month by switching to a Dish network for television, and that their entertainment expenses are primarily limited to occasional movies and meals at fast food restaurants. To generalize again, the debtors take the position that their many recent changes in employment,

income, and living arrangements have simply used up all the income they have, and that they are doing their best to live frugally and to satisfy creditors. They maintain that they have appropriately sought Chapter 7 relief and, through it, a new start.

## DISCUSSION

The bankruptcy administrator brought this motion under § 707(b)(3)(B). Section 707(b)(1) grants the court authority to dismiss a Chapter 7 case if it finds that the granting of relief would be an abuse of the provisions of the chapter. Section 707(b)(3) provides guidance to the court in that determination by directing it to consider "whether the debtor filed the petition in bad faith or the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." The bankruptcy administrator has the burden of proving abuse pursuant to § 707. In re Lipford, 397 B.R. 320 (Bankr. M.D.N.C. 2008); In re Cribbs, 387 B.R. 324 (Bankr. S.D. Ga. 2008). The bankruptcy administrator has conceded that the debtors have filed the petition in good faith, and is proceeding under § 707(b)(3)(B) on grounds that the debtors' alleged ability to pay a meaningful dividend to creditors itself, after passage of BAPCPA, supports a finding of abuse.

For almost two decades, courts in the Fourth Circuit have evaluated motions to dismiss under § 707(b) using the "totality of the circumstances" test set forth in Green v. Staples, 934 F.2d 568 (4th Cir. 1991). In Green, the court set forth the following five factors as relevant to courts' evaluations of whether a filing is abusive:

> The "totality of the circumstances" approach involves an evaluation of factors such as the following:
>
>> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

6

    (2)  Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

    (3)  Whether the debtor's proposed family budget is excessive or unreasonable;

    (4)  Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

    (5)  Whether the petition was filed in good faith.

Green, 934 F.2d at 572.  The Green court noted that "exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." Id.

  BAPCPA amended the statute that is the subject of Green in two ways.  First, it removed the word "substantial" from the phrase "substantial abuse."  In addition, it removed language that established a "presumption in favor of granting the relief requested by the debtor."  The bankruptcy administrator believes that Green's test has been weakened by these amendments and that now, because Congress removed the word "substantial" from the statutory language, the statute implies a "lower standard of review" in which "ability to pay a dividend to creditors is the most important factor."  Bankruptcy Admin.'s Mot. to Dismiss at ¶ 7.  According to the bankruptcy administrator, this court should align with a recent holding of the Bankruptcy Court for the District of South Carolina, which held that "while the totality of all of the debtor's financial circumstances must be examined, the ability to pay a significant dividend to creditors and the failure to do so standing alone can be an abuse of chapter 7, absent mitigating factors."  In re Calhoun, 396 B.R. 270, 276 (Bankr. D.S.C. 2008).

7

The debtors counter that the change to the statute is not significant, and that Green remains good law. In fact, the debtors argue, not only has Green *not* been overturned, it has been elevated as a "valuable touchstone" for construing the statute:

> For purposes of their application, the two grounds for dismissal under § 707(b)(3) are best understood as a codification of pre-BAPCPA case law, with there existing an abundance of reported cases wherein, prior to the passage of BAPCPA, courts dismissed Chapter 7 cases based upon both a debtor's "bad faith" and where the "totality of the circumstances" revealed that the debtor was undeserving of Chapter 7 relief. . . . It is also a rule of construction that an amendment to a statute is not to be construed as abolishing precedent set in prior case law unless such an alteration is clear from the words and context of the amendment. Finally, it is a closely related fundament of statutory construction that, where Congress codifies prior case law, those prior holdings remain not only good law, but should serve as a valuable touchstone for interpreting the statute.

In re Oot, 368 B.R. 662, 665-66 (Bankr. N.D. Ohio 2007) (citations and footnote omitted).

The court agrees with the debtors that Green remains good law. Although the statute has been modified by BAPCPA, it remains appropriate to apply pre-BAPCPA concepts for determining abuse under § 707(b)(3). See, e.g., In re Hornung, 425 B.R. 242, 249 (Bankr. M.D.N.C. 2010) ("This court has held that pre-BAPCPA cases, such as Green, remain instructive in an analysis pursuant to new Section 707(b)(3)."); Lipford, 397 B.R. at 327 (same); In re Cribbs, 387 B.R. 324, 334 (Bankr. S.D. Ga. 2008) ("[The court] reaffirm[s] pre-BAPCPA authority in this District and find[s] that in order for the United States Trustee to satisfy its burden under the 707(b)(3)(B) 'totality of the circumstances' test, the Trustee must show more than just Debtors' ability to pay."); see also In re Barbour, Case No. 09-00553-8-RDD, slip op. at 3 (Bankr. E.D.N.C. Sept. 18, 2009) ("BAPCPA includes the judicially-created totality of the circumstances test . . . .").

The bankruptcy administrator emphasizes the differences in the language of this statute as it now exists, as compared to the pre-BAPCPA version. The omission of the word "substantial" in

the amended statute signifies, according to the bankruptcy administrator, that the standard for finding abuse is now lower than it was prior to the passage of BAPCPA. The bankruptcy administrator noted that prior to BAPCPA's passage, he would not have pursued a § 707(b)(3)(B) motion in this case. However, because he believes that with "minor" adjustments the debtors can afford to pay approximately $500 per month to unsecured creditors, he contends that the amended statute requires that they do so.

The debtors argued during the hearing that "substantial abuse" always means "just plain old abuse," in that if a bankruptcy court finds an abuse of Chapter 7, that finding is – and has been, all along – sufficient to warrant dismissal under § 707(b). The debtors reasoned that no bankruptcy court, if it found *any* level of abuse, would ever allow a Chapter 7 case to proceed, so deletion of the word "substantial" has no real effect on a court's assessment of the facts in each case or application of Green's totality of the circumstances analysis. The debtors' arguments are supported by Collier on Bankruptcy, which opines that it is "doubtful that the grounds for dismissal will change much, despite the change in the standard from "substantial abuse' to 'abuse.' Few, if any, courts permitted a case to go forward under prior law if they found it abusive. The general view appeared to be that any abuse was substantial and grounds for dismissal." Collier on Bankruptcy ¶ 707.04[3][b], at 707-43 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) Some cases, however, have held that BAPCPA lowered the level of abuse necessary for dismissal. See Lipford, 397 B.R. at 327; In re Mestemaker, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007) ("Congress has clearly lowered the standard for dismissal in changing the test from 'substantial abuse' to 'abuse.'"). Among those courts that consider the standard to be lower, many still find pre-BAPCPA cases "instructive." See, e.g., Lipford, 397 B.R. at 327; In re Mondragon, 2007 WL 2461616 *1 (Bankr.

D.N.M. 2007); In re Colgate, 370 B.R. 50, 56 (Bankr. E.D.N.Y. 2007) (determining that standard to find cause to dismiss is lower, but same tests still apply).

The question of Green's continuing vitality in this circuit is an important one, and the court agrees that whether the BAPCPA amendments require that the factors be weighed differently is worthy of discussion. This case, though, does not give the court a basis on which to weigh in on that debate. As is more specifically discussed below, this case does not provide a framework in which to flesh out the impact, if any, of BAPCPA's amendments on the Green totality of the circumstances test. The court ultimately concludes that the debtors' filing would pass both a "full-strength" and "weakened" Green test, because the filing does not support a finding of *any* abuse at all. The court also concludes that the debtors have no meaningful ability to pay creditors, so that if such were the primary criteria, as has been suggested by the bankruptcy administrator, then, similarly, no abuse would be found.

Because the Green analysis does apply, the court will review each factor in turn.

1. *Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment:* The evidence is ample that these debtors have been uprooted twice in the past two years – once due to layoff and then again due to transfer. They valiantly attempted to resolve their debts short of bankruptcy through a formal debt repayment plan, but were unsuccessful. Mrs. Mitchell has diligently worked at part-time jobs to enhance the family income, but has found that work inconsistent, and it has yielded lower income than anticipated. The court concludes that the bankruptcy petition was filed as a result of a classic "domino" series of events which, cumulatively, disrupted the debtors' established financial patterns and then precipitated the initiation of a lawsuit against them, despite commendable efforts to avoid it.

2. *Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay:* Mr. Mitchell testified that he had not made any substantial consumer purchases in the past two years and that his purchases of computer equipment prior to that time were made when he had the ability to pay and also were necessary to his work. The court finds that the debtors incurred cash advances and made consumer purchases that proved to be beyond their ability to repay only when their financial circumstances changed. There was no egregious accumulation of consumer purchases.

3. *Whether the debtor's proposed family budget is excessive or unreasonable:* In response to the court's question, the bankruptcy administrator identified the following areas of the debtors' expenses as being "on the high side": food, transportation, entertainment and recreation, utilities, pet care, housing, television service, and the approximately $325 per month allocated toward the car insurance and living expenses of the debtors' elder son. Basically, most areas of the debtors' listed expenses appeared, to the bankruptcy administrator, to present some opportunity to cut costs. The bankruptcy administrator projected that the debtors could, with further belt-tightening, dedicate $500 per month toward repayment of approximately $106,000 in unsecured debt. In other words, throughout all of these categories, the bankruptcy administrator believes that an additional $175 can be extracted which, combined with the support given to the elder son, would allow a meaningful distribution to creditors.

An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. In re Lipford, 397 B.R. at 327-28; citing Shaw v. U.S. Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (Bankr. M.D.N.C. 2004). As the Lipford court noted, "[a]lthough a number of courts

have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test." Lipford, 397 B.R. at 328 & n.4, citing In re Behlke, 358 F.3d 429, 437 (6th Cir. 2004) (finding substantial abuse where debtor could pay a dividend of 14% to 23%); Shaw, 310 B.R. at 342 (paying dividend of 29% over 36 months constituted significant portion of debtor's debts); In re Jarrell, 189 B.R. 374, 376 (Bankr. M.D.N.C. 1995) (finding substantial abuse where debtors could pay 80% of debt over 36 months); but see In re Stewart, 383 B.R. 429, 435 (Bankr. N.D. Ohio 2008) (finding no abuse where debtor potentially could pay 35% over 60 months).

In this case, if the court were to find that $500 per month was available to fund a Chapter 13 plan, the dividend to unsecured creditors in a five-year plan would be less than 28%, because the $106,228.54 in listed unsecured debts would be substantially increased by the deficiency claims of Chase Manhattan Mortgage Corp. and Irving Home Equity, after surrender of the Michigan home. Using the same anticipated unsecured pool and plan duration, the dividend would be less than 18% if the court were to find that the debtors' funding of their college' age son was inappropriate, creating an allocation of $325 per month to the plan. Finally, if the court were to find that payments to the college-age son were appropriate, but that further belt tightening elsewhere would yield $175 per month for payments to creditors, the dividend would be less than 10%.[1]

The court finds that the debtors' proposed family budget is reasonable. It is based on the debtors' current income and expenses as of the fall of 2010, though the debtors' finances were at that

---

[1] Ultimately, it will not be necessary to determine whether possible dividends in the range of 10% to 28% constitute an ability to repay that, under the circumstances, supports a finding of abuse, because the court concludes based on the facts before it that the debtors' expenses are reasonable and no consistent disposal income exists to fund a Chapter 13 plan.

12

time, and had previously been, in a state of flux. There may well be additional fluctuations, particularly with regard to Mrs. Mitchell's retail hours, which will likely be affected both positively and negatively by seasonal employment swings. The court is not persuaded that, in light of those fluctuations, the debtors could consistently allocate $175 per month to a Chapter 13 plan (the amount of excess calculated by the bankruptcy administrator, exclusive of the contribution to their son's support). Additionally, the court questions whether, even if the $175 per month were consistently available, such a sum would provide creditors with a meaningful distribution in a Chapter 13 case. Therefore, at most what is at issue is the debtor's contribution to their college-age son, and it is that component which forms the basis for the bankruptcy administrator's greatest challenge to the reasonableness of the debtors' budget. Mr. Mitchell testified that the $325 amount on the amended Schedule J is the monthly average (based on two months) that the debtors gave to their 19-year old son once they moved to Atlanta, leaving him to reside in Raleigh. This amount includes $140 for auto insurance. The authorities are split on whether debtors may include in their monthly expenses assistance for children whom the debtors no longer have a legal obligation to support, because the children have reached the age of majority.

This court has previously acknowledged that "[a]dult children may be considered dependents of the debtors where they are relatively young adults studying for their baccalaureate degrees." In re Badake, Case No. 05-05272-8-JRL (Bankr. E.D.N.C. 2006) (Order dated Feb.15, 2006). In that case, Judge Leonard relied upon the ruling in In re Gonzales, 157 B.R. 604, 610-611 (Bankr. E.D. Mich. 1993), in which that court upheld a $400 per month payment to a 19-year-old daughter and a $300 per month payment to a 21-year-old daughter as reasonably necessary expenses for the support of full-time college students. Id. at 610-11. "At the very least," the Gonzales court

reasoned, "just as society accepts as reasonable an adult child's assumption of the moral obligation to support an aged or infirm parent, it now accepts as reasonable a parent's own feeling of the moral imperative of assisting a willing child to obtain a higher education."  Id. at 610; see also In re Tefertiller, 104 B.R. 513 (Bankr. N.D. Ga. 1989) (denying trustee's motion to dismiss under § 707(b) where debtor paid college expenses of 21-year old daughter); In re Wegner, 91 B.R. 854 (Bankr. D. Minn. 1988) (holding that debtor's support of adult children and grandchildren was not substantial abuse).

In this case, the debtors' 19-year-old son is working to support himself as he attends classes at Wake Technical Community College, and the $325 per month that debtors provide supplements the money he earns on his own so that he may have auto insurance and enough money for rent and other necessary living expenses.  This situation can be distinguished from cases that have held that debtors may not support adult children.  Cf. In re Seymour, 2004 Bankr. LEXIS 2389 (Bankr. M.D.N.C. 2004) (debtors were providing $650 each month for an adult child attending college in addition to other expenses the court deemed to be extravagant; the court concluded that but for these expenses, debtors would have had $2,000 a month to pay to unsecured creditors in a Chapter 13 plan).

The amount of support is not unreasonable and the debtors are not engaging in any abuse of the bankruptcy system by continuing to offer some small amount of financial support to a teenage son in college.  The Bankruptcy Code recognizes that there are family obligations just as there are statutory and financial ones, and that the purpose of the totality of the circumstances analysis is to assess the unique facts of the case before the court.  It would be the rare case where family circumstances do not affect expenses, and voluntary familial ones are not, by virtue of their personal

14

nature, automatically "suspect." In conclusion, the debtors' proposed budget, inclusive of the monthly stipend to their son and those items designated by the bankruptcy administrator as being on the "high end," is not excessive or unreasonable.

    4. *Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition:* Both the bankruptcy administrator and the debtors acknowledge that it is difficult to tell if the debtors' current schedules accurately reflect their actual income and expenses, given that the debtors' financial and personal situation has been in a state of flux since before the petition was filed. The debtors have moved twice in the past few years, and Mrs. Mitchell's income recently decreased while also becoming more irregular. The court can conclude, however, that the debtors have done the best they can to report their income and expenses and there is no indication that they have failed to report any information that would be important to this analysis.

    5. *Whether the petition was filed in good faith:* The bankruptcy administrator has alleged no bad faith on the part of the debtors and there is no evidence of any bad faith in the record.

    Even if the court were to accept the bankruptcy administrator's argument that the ability to pay something to creditors is, *itself*, the determining factor in assessing whether a Chapter 7 case is abusive, it would conclude that the debtors simply do not have sufficient and consistently available excess funds with which to do so. Assuming a wholly hypothetical spectrum ranging from "substantial" abuse to "regular" abuse to abuse in negligible amounts, in this case, there is simply no basis on which to find any abuse at all.

Based on all of the foregoing, application of Green's totality of circumstances test results in the inescapable conclusion that no abuse exists in this case. The court reaches this conclusion without the need of a presumption in the debtors' favor.

## CONCLUSION

Under § 707(b)(3)(B), the totality of the circumstances of the debtors' financial situation do not demonstrate abuse. For the foregoing reasons, the bankruptcy administrator's motion to dismiss for abuse is hereby DENIED.

**END OF DOCUMENT**